In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-2239

TEXAS UJOINTS LLC,

*Plaintiff-Appellant,*

*v.*

DANA HOLDING CORP., *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:13-cv-01008-WCG — **William C. Griesbach**, *Judge.*

ARGUED NOVEMBER 29, 2016 — DECIDED DECEMBER 16, 2016

Before POSNER, EASTERBROOK, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.* In this diversity suit, governed by Texas law, the plaintiff, Texas UJoints (to simplify, we'll call it just UJoints), argues that it was a dealer in products of Dana Holding Corporation (a supplier of drive shafts, which typically are devices for transmitting power from an engine to the wheels of a vehicle, and other industrial equipment), in particular Dana's GWB and Spicer products, and that Dana terminated the dealership of GWB products in violation

of a Texas statute. (Dana is the principal defendant; we can ignore the others.) The statute provides that "a supplier may not terminate a dealer agreement without good cause," Vernon's Texas Statutes and Codes Annotated, Business and Commerce Code § 57.153, "dealer agreement" being defined as "an oral or written agreement or arrangement, of definite or indefinite duration, between a dealer and a supplier that provides for the rights and obligations of the parties with respect to the purchase or sale of equipment or repair parts." § 57.002(4). But "good cause for termination of a dealer agreement exists ... if there has been a sale or other closeout of a substantial part of the dealer's assets related to the business." § 57.154(a)(4).

Dana had a dealer agreement in Texas with a company named Automotive Industrial Supply Co. ("AISCO"). Unbeknownst to Dana, AISCO sold off most of its assets to a newly formed company named DanMar Holdings (unrelated to Dana), which in turn transferred the assets to a firm named Texas UJoints. The name "UJoints" had been a trade name used by AISCO, but now became the name of an independent firm, the plaintiff in this case. That transfer of assets, like AISCO's sale of its assets to DanMar, gave Dana, pursuant to § 57.154(a)(4), quoted above,  good cause to terminate its dealer agreement with AISCO. The termination precluded Texas UJoints from claiming to have been authorized to step into AISCO's shoes and thereby become a Dana dealer in Texas. And so the district judge held, granting summary judgment in favor of Dana.

The transfer of assets from DanMar to UJoints had taken place in September 2012. In November the two owners of DanMar (who were also the owners of UJoints), Dan Zahn

and Martin Brown (hence "DanMar"), met for the first time with representatives of Dana. Zahn and Brown did not reveal the existence of DanMar or UJoints but said they'd bought AISCO; they hadn't, though they had bought its assets.

Dana's representatives told Zahn and Brown that they would have to submit a business plan for their reconstituted AISCO (i.e., UJoints). Discussions with Dana continued for months, and finally in May 2013 Zahn sent Dana a PowerPoint presentation containing the business plan. But the following month Dana informed Zahn that it wouldn't make UJoints a Dana dealer of its GWB products, although it would allow UJoints to continue selling the Spicer products. UJoints responded by filing this suit, which Dana removed to the federal district court in the Eastern District of Wisconsin. The court ruled for Dana, precipitating this appeal.

UJoints argues that either Dana entered into a new dealer agreement with it or UJoints had become a party to Dana's agreement with AISCO just by virtue of the transfer of AISCO's assets to it. There was no new dealer agreement, however; and as for the sale of AISCO's assets to UJoints, since that was "a sale or other closeout of a substantial part of the dealer's assets related to the business" it gave Dana good cause to terminate its dealer agreement with AISCO pursuant to § 57.154(a)(4). The termination left Dana with no business relations with AISCO and no shoes for UJoints to step into and to claim to be an authorized Dana dealer, bound to Dana by an agreement.

UJoints argues that Dana terminated the agreement only because of complaints from other dealers. That's irrelevant. Dana had good cause to terminate the agreement once

AISCO sold its assets. UJoints points out that at the November meeting a Dana representative told Brown and Zahn: "I don't care what you are going to do or how you are going to do it as long as it includes [Bob Stoddard, a long-time AISCO employee]." UJoints argues that this statement constituted Dana's blessing UJoints' stepping into AISCO's shoes as a Dana dealer by purchasing AISCO's assets. No way; at the November meeting Dana's representatives didn't know that UJoints had purchased AISCO's assets. And Zahn testified that Dana's representatives didn't make any promises at the November meeting, or at any other meeting.

UJoints is left to argue that Dana "intentionally and expressly entered into a dealership agreement with" UJoints after learning that UJoints had acquired AISCO's assets. This is not inconceivable, since Dana had been content to use those assets in its business. As evidence of a dealership agreement with Dana, UJoints points out that until Dana terminated its relationship with it in June 2013, Dana gave it its standard distributor terms and conditions and protocols for ordering product, introduced Zahn and Brown to Dana officials in Germany (where apparently some of Dana's products originate), sent UJoints a credit application to fill out "as part of the partnership going forward," provided UJoints with certain product specifications, and continued filling orders by UJoints for products for UJoints to distribute.

But UJoints has again missed the point. When AISCO's assets were shifted to UJoints, Dana naturally wanted to learn more about the new company, and so it cooperated with UJoints to the extent of providing some inducements to it to continue distributing Dana products. That does not

mean that Dana entered into a "dealer agreement," specifying the ongoing rights and obligations of it and UJoints—a new, unknown entity the identity of which the owners had concealed from Dana for a significant time, which must have undermined their credibility with Dana. Glancing back at our quotations from the Texas statute, we see that a distributor agreement can be of indefinite duration, implying that it can be terminated at any time if no duration is specified, and none was here, and also that it can be terminated because the distributor sold its assets, which AISCO did.

All else aside, precipitate classification of a pattern of dealing as a dealership agreement terminable only for good cause would have a disruptive effect on distribution. When a distributor suddenly vanishes, the supplier may still need its distribution; it may be unable to afford the protracted interruption that might ensue if it lost its existing distribution and had to create a new system of distribution from scratch. It is also natural for a supplier to want to learn more about a successor to its former dealer before granting the successor a dealership. And so it was natural for Dana to continue selling, for a time, to its dealer's, AISCO's, successor—UJoints.

Obviously not all sales are pursuant to dealer agreements, as opposed to merely being agreed upon. If you buy a car from someone and resell it, that doesn't make you a dealer, and so the fact that UJoints bought products from Dana and resold them did not make UJoints a party to a dealer agreement. Because UJoints was distributing Dana's products, Dana had to furnish it with information necessary to facilitate that distribution and avoid errors. That provision of information, necessary for efficient distribution even if

there is no dealer agreement, did not constitute or create such an agreement.

The judgment of the district court is therefore affirmed.